

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-1998

# United States v. Rudolph

Precedential or Non-Precedential:

Docket 96-5726

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Rudolph" (1998). *1998 Decisions.* Paper 34.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/34

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 23, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5726

UNITED STATES OF AMERICA

v.

DEANDRE RUDOLPH, a/k/a "Rudy"

Deandre Rudolph,
        Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 96-cr-00162-01)

Argued September 15, 1997

Before: BECKER, Chief Judge, SLOVITER and
SCIRICA, Circuit Judges

(Filed February 23, 1998)

        Peter V. Ryan (Argued)
        West Orange, New Jersey 07052
         Attorney for Appellant

        Faith S. Hochberg
         United States Attorney
        Kevin McNulty
        Allan Tananbaum (Argued)
         Office of United States Attorney
        Newark, New Jersey 07102
         Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

Deandre Rudolph, who pled guilty to bribery and sale of government property, appeals his sentence on the grounds that the district court (1) improperly enhanced hi s sentence pursuant to U.S.S.G. S 2C1.1(b)(1), and (2) improperly failed to group the two convictions under U.S.S.G. S 3D1.2. Because there was no trial, most of the relevant facts were obtained from Rudolph's presentence report.

In March 1995, Gerard Felix, who was arrested on charges unrelated to this case, admitted to having made corrupt payments to employees of the Immigration and Naturalization Service and other Justice Department employees in return for illegal assistance. During the course of his subsequent cooperation with the government, Felix identified, inter alia, the appellant, Deandre Rudolph, an INS Special Agent based in Newark, New Jersey, as one of those government employees. Felix told the agents that in the fall of 1994, Rudolph had accepted a total of $1,500 from him in return for an INS metal template, a device that imprints a marking when fingerprints and signatures are affixed to alien registration "green" cards to demonstrate authenticity. Felix cooperated in the ensuing investigation of Rudolph, during which several telephone calls between Felix and Rudolph were monitored.

In October 1995, Felix asked Rudolph to obtain a federal Presentence Report (PSR) prepared by the United States Probation Office in the Southern District of New York in exchange for $1,000. Thereafter, Felix and Rudolph met on October 18, 1995 at a diner in Irvington, New Jersey to discuss the proposed sale of the presentence report. At that meeting, Rudolph requested more specific information identifying the subject of the report.

The following day, after Felix provided Rudolph with the date of birth of the subject of the report, Rudolph

telephoned Felix from his INS office and told him that he had the report. They agreed to meet that afternoon to make the exchange, but at that meeting Rudolph, who displayed the PSR, sought more money than Felix had originally offered because the PSR was highly confidential. Ultimately, Rudolph accepted the $1,000 for the PSR at a later meeting. Rudolph had used an unsuspecting colleague in the INS office to obtain the copy of the PSR.

Approximately one month later, on November 21, 1995, Rudolph, Felix and Wesley Clement, who was described as "an illegal document vendor," met by prearrangement so that Clement could purchase an INS metal template from Rudolph. During negotiations, Rudolph explained that this transaction was riskier than the sale of the template in the fall of 1994 because this time there would be "cameras up in the ceiling." The three men met again an hour later, and Clement turned over $4,000 in cash for the template. According to Felix, Clement purchased yet another template shortly thereafter.

Rudolph was arrested on December 22, 1995. On January 18, 1996, a three-count indictment was filed in the United States District Court for the District of New Jersey charging Rudolph with (1) demanding, seeking, and receiving a monetary bribe as a public official to make opportunities for the commission of fraud by providing an I-89 template for use in fraudulent applications to the INS for permanent residence, in violation of 18 U.S.C. SS 201(b)(2)(B) and 2; (2) demanding, seeki ng, and receiving a monetary bribe as a public official in order to be induced to act in violation of his official duty by providing an I-89 template to a person not authorized to receive it, in violation of 18 U.S.C. SS 201(b)(2)(C) and 2; and (3) converting to his own use and without authorit y selling, conveying and disposing of an I-89 metal template belonging to the INS, in violation of 18 U.S.C. SS 641 and 2. All three counts related to Rudolph's supply of the template to Clement in November 1995 in exchange for money.

On March 22, 1996, pursuant to a written plea agreement, Rudolph pled guilty to count one of the indictment, charging him with receiving a bribe in violation of 18 U.S.C. S 201(b)(2)(B), and waived indictment and pled

3

guilty to a one-count information charging him for the first time with sale of government property, namely a Presentence Investigation Report, in violation of 18 U.S.C. S 641. Counts two and three of the indictment originally presented were dismissed.

The district court sentenced Rudolph on October 23, 1996, to two concurrent 16-month terms of imprisonment, to be followed by 3 years of supervised release. In addition, the district court ordered Rudolph to pay a $7,500 fine for each count of conviction, for a total of $15,000. Final judgment was entered on October 28, 1996, and Rudolph filed a timely notice of appeal on October 31, 1996.[1]

II.

Rudolph asserts that it was improper for the district court to increase his offense level by two levels under U.S.S.G. S 2C1.1(b)(1) based on his admissions to the probation department that he had accepted two additional bribes that were not the subject of a charge. Section 2C1.1 provides for a base offense level of ten for "offering, giving, soliciting, or receiving a bribe" and mandates a two-level increase if the offense "involved more than one bribe or extortion." See U.S.S.G. S 2C1.1(b)(1),(2). In reviewing the district court's application of S 2C1.1(b)(1), the factual findings are reviewed for clear error, while the application and interpretation of the Guidelines are subject to plenary review. See United States v. Felton, 55 F.3d 861, 864 (3d Cir. 1995).

Rudolph is not challenging the court's finding that he accepted the two uncharged bribes. In fact, Rudolph

_____

1. Although the notice of appeal listed only the docket number for Rudolph's conviction for the sale of the presentence report, and not the docket number for the bribery conviction, the government concedes that the omission of the docket number of the latter was an inadvertent typographical error as there was functionally only a single prosecution, plea hearing, presentence report and sentencing hearing and that Rudolph's brief clearly discloses an intent to appeal both convictions. The government stipulates notice, as it was neither misled or prejudiced. See Brief of Appellee at 3-4. We conclude under these circumstances that we have jurisdiction over the entire appeal.

4

acknowledged during the sentencing hearing that he had admitted to the probation officer that he accepted bribes for three templates, and the district court considered that admission in making its finding that Rudolph had accepted three bribes. App. at 75. Rudolph's contention is that his two uncharged bribes do not qualify as relevant conduct for purposes of an enhancement under the sentencing guidelines.

Under S 2C1.1(b)(1), the defendant's base offense is increased by 2 levels if more than one bribe is involved. In determining whether there has been more than one bribe, it is necessary to consider "relevant conduct" as defined in S 1B1.3. That section defines relevant conduct as "all acts and omissions committed, aided, abetted . . . procured, or willfully caused by the defendant . . . during the commission of the offense of conviction, in preparation for the offense of conviction, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. S 1B1.3(a)(1). Where the conduct at issue, if charged, would be groupable with a charged offense pursuant toS 3D1.2(d), however, the definition of relevant conduct also includes "all acts and omissions committed, aided, abetted. . . procured, or willfully caused by the defendant . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G.S 1B1.3(a)(2). See also United States v. Wilson, 106 F.3d 1140, 1143 (3d Cir. 1997).

Offenses can be part of "the same course of conduct" if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. S 1B1.3, appl. note 9(B). Similarly, offenses may constitute part of a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. U.S.S.G. S 1B1.3, application note 9(A).

Here, had they been charged, Rudolph's two uncharged bribes would certainly have been groupable with the bribe charged in count one of the indictment. Thus, it was proper for the district court to consider them as relevant conduct

if they "were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. S 1B1.3(a)(2).

As indicated in the Presentence Investigation Report, Felix was "a highly credible cooperating defendant," and provided the probation department with information concerning his and Rudolph's respective roles in each of the three bribes. That information was corroborated by tape recorded conversations and by Rudolph's own admissions. Accordingly, we cannot say that the district court'sfinding by a preponderance of the evidence that the two uncharged bribes were "relevant conduct" as defined by the Sentencing Guidelines was erroneous.

Rudolph asserts that relevant conduct that is uncharged may not be the basis of a sentencing enhancement. However, the Commentary to S 1B1.3 specifically notes that "conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." Accordingly, this court has consistently rejected the argument that only charged conduct may be grounds for a sentencing enhancement. See United States v. Baird, 109 F.3d 856, 863 (3d Cir.) ("conduct not formally charged . . . can be considered at sentencing"), cert. denied, 118 S. Ct. 243 (1997); United States v. Sokolow, 91 F.3d 396, 411 (3rd Cir. 1996) (affirming district court's use of uncharged conduct for purposes of sentencing determination pursuant to S 1B1.3(a)(2)); United Sates v. Pollard, 986 F.3d 44, 47 (3d Cir. 1993) ("the court may consider uncharged conduct in determining whether and how to apply upward or downward adjustments"). Cf. United States v. Frierson, 945 F.2d 650, 652–54 (3d Cir. 1991) ("relevant conduct" included offenses that were charged in the indictment but dropped pursuant to a plea agreement), cert. denied, 503 U.S. 952 (1992).

Rudolph's principal contention on this issue is that use of the uncharged bribes is precluded by our decision in United States v. Thomas, 961 F.2d 1110 (3d Cir. 1992). However, as the district court noted, Thomas is distinguishable. In Thomas we held it was impermissible to depart upward from the guideline range on the basis of

uncharged crimes. Id. at 1120. In this case, the uncharged crimes are being used merely as part of the defendant's relevant conduct. We thus reject Rudolph's argument that Thomas is "controlling." Appellant's Br. at 24-25.

Moreover, we recently held in Baird that "even in the plea bargain context, conduct underlying dismissed counts may support an upward departure." 109 F.3d at 860. The analysis in Baird was informed by the Supreme Court's decision in United States v. Watts, 117 S. Ct. 633, 635-36 (1997), which held that a sentencing court could consider conduct of which a jury acquitted a defendant. See also United States v. Goggins, 99 F.3d 116, 119 (3d Cir. 1996) (conduct relating to dismissed counts or counts on which defendant is acquitted may be germane to imposition of enhancement under U.S.S.G. S 2D1.1(b)(1)), cert. denied, 117 S. Ct. 1347 (1997). As we recognized in Baird, to the extent that Thomas is inconsistent with Watts, Watts is controlling. Baird, 109 F.3d at 866.

We turn to Rudolph's request that we reject the district court's decision to consider his statements to the probation officer and "bar the usage of [his] admission based on a violation of due process." Appellant's Br. at 20. Rudolph argues that he made the admissions concerning the additional bribes because he faced an untenable choice during his presentence interview with the probation officer. He contends that he believed he would have been ineligible for the two-level downward adjustment for acceptance of responsibility pursuant to S 3E1.1 if he had refused to answer truthfully the probation officer's questions concerning the two uncharged bribes. Therefore, faced with what he terms a "catch-22" situation because he was concerned that an admission of that uncharged conduct would expose him to the S 2C1.1(b)(1) enhancement, Rudolph, through counsel, chose to acknowledge the uncharged conduct in order to obtain the adjustment for acceptance of responsibility. See App. at 13.

Of course, as Rudolph states in his brief, the guidelines permit a defendant to "remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection." U.S.S.G. S 3E1.1 application note 1(a)(emphasis added). In

7

lieu of remaining silent, Rudolph, on the advice of counsel, chose to speak. Thus, contrary to his assertion, Rudolph was not put to a Hobson's choice, as he did not need to offer information on, or even respond to, questions concerning relevant conduct beyond the strict parameters of his offense of conviction. See United States v. Taylor, 72 F.3d 533, 551 (7th Cir. 1995). Nothing about the situation in which he was placed (which is no different from that in which numerous defendants find themselves) implicated his rights under the Due Process Clause. While there may have been miscalculation by Rudolph's counsel, there was no governmental coercion.

There is some suggestion, although no explicit accusation, that the probation officer's questions may have misled Rudolph and/or his counsel as to the extent of Rudolph's responsibility to speak to uncharged conduct. Rudolph directs us to nothing in the record to support that suggestion. At the sentencing hearing, both parties agreed that there was no issue of fact with respect to Rudolph's admissions and, although the court arranged for the probation officer to be present in the event either party wanted her to testify, see App. at 52, neither party called her.

At the sentencing hearing, Rudolph's counsel conceded that he knew of no authority that would require a probation officer to give Miranda warnings. App. at 51. Moreover, it is clear from our prior precedent that while a court may consider a defendant's candor and remorse concerning a charged offense, a defendant's silence concerning uncharged conduct will not jeopardize this reduction. See United States v. Price, 13 F.3d 711, 735 (3d Cir.), cert. denied, 513 U.S. 853 (1994). We thus reject all of Rudolph's arguments based upon the use of his admissions of the two uncharged bribes, and hold that the district court neither erred nor abused its discretion in enhancing Rudolph's sentence pursuant to S 2C1.1(b)(1).

III.

Rudolph also contends that the district court erred as a matter of law in refusing to group together for purposes of

calculating his appropriate offense level the bribery offense and the offense of sale of government property. He argues that the two counts should have been grouped pursuant to U.S.S.G. S 3D1.2, which would have resulted in an offense level equal to that for the most serious of the counts in the group pursuant to S 3D1.3. Although the plea agreement stipulated that the offenses were groupable under S 3D1.2(d), it expressly acknowledged that the stipulation did not bind the sentencing court. App. at 15. The district court found that the crimes did not "involve substantially the same harm," U.S.S.G. S 3D1.2, and therefore did not group the offenses. Accordingly, the district court adopted a final guideline range of 12 to 18 months instead of the 10 to 16 month range that defendant sought. The 16 month sentence Rudolph actually received would have fallen within either range.

Our review of the district court's interpretation and construction of the guidelines in refusing to group multiple offenses under S 3D1.2 is plenary. See United States v. Griswold, 57 F.3d 291, 295 (3d Cir.), cert. denied, 116 S. Ct. 428 (1995); United States v. Bush, 56 F.3d 536, 537 (3d Cir. 1995). The district court's factual findings in determining whether the offenses charged were part of one overall scheme or a continuing course of criminal conduct are reviewed for clear error. Griswold, 57 F.3d at 295; Bush, 56 F.3d at 537–38.

The rationale underlying grouping for sentencing purposes is to prevent the imposition of "multiple punishment for substantially identical offense conduct." See U.S.S.G. Ch. 3 Pt. D, intro. comment. In that effort, the sentencing guidelines provide that "all counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. S 3D1.2. See Seligsohn, 981 F.2d at 1425 ("The purpose [of S 3D1.2] is to impose incremental punishment for significant additional criminal conduct, but at the same time prevent double punishment for essentially the same conduct.") (internal quotations omitted). In addition, the concept of grouping was adopted, at least in part, "[i]n order to limit the significance of the formal charging decision." U.S.S.G. Ch. 3 Pt. D, intro. comment. Nevertheless, courts have not been given carte blanche to

9

use their authorization to group offenses for sentencing purposes as a vehicle to override a prosecutor's decision to charge certain offenses and not others. Rather, counts may be grouped by the court only when they meet the specific requirements listed in U.S.S.G. S 3D1.2.

The general principle applicable to grouping is set forth in the first sentence of S 3D1.2 under the heading "Groups of Closely-Related Counts" and provides, "[a]ll counts involving the same harm shall be grouped together in a single group." The guideline then gives four circumstances when "[c]ounts involve substantially the same harm within the meaning of this rule" and are to be grouped.2 These cover (a) counts involving a single victim and a single incident, (b) counts involving a single victim and connected incidents, (c) offenses in which one count is also a specific offense characteristic of another count, and (d) offenses where guidelines are based primarily on quantity or contemplate continuing conduct. Unless the circumstances fall within the language of one of the four subsections, the offenses cannot be grouped.

_____

2. The relevant language in full is:

  All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

  (a) When counts involve the same victim and the same act or transaction.

  (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

  (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

  (d) When the offense level is determined largely on the basis of the
  total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. S 3D1.2.

The guideline enumerates those offenses that are eligible for grouping under subsection (d) and those that are not. See Seligsohn, 981 F.2d at 1425. Because the offenses at issue here, covered by S 2B1.1 (theft) andS 2C1.1 (bribery), are eligible for grouping the grouping determination must be made based upon the facts of the case, and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level.

In this case, the government stipulated in the plea agreement that Rudolph's offenses should be grouped pursuant to subsection (d) of S 3D1.2. App. at 19. That is the subsection Rudolph proffered in the district court, and the subsection the district court addressed at Rudolph's sentencing hearing. Subsection (d) authorizes grouping "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of the substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." U.S.S.G. S 3D1.2(d) (emphasis added).

We have previously explained that the language in subsection (d) emphasized above "is intended to require grouping where the offense conduct is ongoing or continuous and the offense level provided by the applicable offense guideline already takes into account the fact that there has been a course of harmful conduct." United States v. Ketcham, 80 F.3d 789, 796 (3d Cir. 1996) (emphasis added). Thus, subsection (d) seeks to eliminate duplication created by what is, in essence, merely an aggregation of harm or a course of conduct that has already been taken into account by the setting of the offense level.

The district court assumed, without deciding, that Rudolph's offense conduct was ongoing and continuous but deemed it doubtful that accepting bribes and stealing a presentence report constitute the type of ongoing criminal conduct envisioned by S 3D1.2(d).3  App. at 67. The court,

_____

3. We will make the same assumption of continuity, despite similar doubt. We reject the theory offered by Rudolph's counsel at oral

following our analysis in Ketcham, determined that grouping pursuant to S 3D1.2 was inappropriate because Rudolph's "offense levels provided by the applicable guidelines do not take into account a course of harmful conduct." App. at 67-68. We cannot find error in the district court's application of S 3D1.2(d).

It is clear from the language of subsection (d) that if the offense level is not determined on the basis of amount of harm or loss, then grouping is not authorized under this subsection based on continuing conduct unless the offense guideline expressly takes into account the continuing nature of the conduct. An example of a guideline that does so appears in U.S.S.G. S 2G2.2(b)(4), which provides for a 5-level increase "[i]f the defendant engaged in a pattern of activity." In contrast, nothing in SS 2B1.1 or 2C1.1, the guideline sections under which Rudolph was sentenced, explicitly takes into account a continuing course of conduct. Although S 2C1.1(b)(1) provides for an enhancement if there is more than one bribe, and Rudolph's offense level was enhanced accordingly because he took more than one bribe in exchange for INS templates, that enhancement did not encompass, and was not in any way based upon, Rudolph's theft of the Presentence Investigation Report. Yet those are the two offenses Rudolph argues we should group.

In Bush, we stated that in grouping decisions "courts must distinguish between occasions when increasing the punishment for an additional count would punish the defendant for conduct taken into account in another count

_____

argument that because the theft and two of the bribes were arranged and/or monitored by the government, Rudolph's activities were ongoing or continuous in nature. Rudolph's first two offenses were separated by approximately one year and, although Felix played a role in both, there is no evidence that Clement, who was the source of funds in the template bribe offense, had any connection to the theft of the PSR. See Bush, 56 F.3d at 541 (holding that district court would have acted properly in finding that defendant's five firearms purchases over a period of several months did not constitute a continuing course of conduct where guns were not purchased with funds from a common source nor were they all to be used for a particular purpose).

12

and those occasions when the added counts reflect additional criminal culpability." 56 F.3d at 538. Thus, in Griswold, we affirmed the district court's refusal to group certain firearms offenses where, as here, the defendant's "multiple counts encompassed numerous instances of illegal conduct" and the offense guideline under which defendant had been sentenced did not cover multiple violations such that defendant would be punished for the same conduct under different counts. 57 F.3d at 296–97; cf. United States v. Riviere, 924 F.2d 1289, 1303–06 (3d Cir. 1991) (holding that three firearms offenses which were based on essentially one instance of criminal conduct should have been grouped).

Here, the district court noted that in Bush we stated that the guidelines provide that "[a]ll counts involving essentially the same harm shall be grouped into a single Group," 56 F.3d at 538, but it reasoned that Rudolph's offenses caused analytically distinct harms. Admittedly, both of Rudolph's offenses compromised the public's trust in the government and its officials because a government official was involved. However, as the district court noted, Rudolph's acceptance of the bribes in exchange for templates could have enabled untold numbers of illegal aliens to create illegitimate proofs of residence in the United States, and thereby "undermines the United States policy on immigration by permitting a virtual unlimited number of persons to obtain permanent residency in this country." App. at 69. Rudolph's action in using his access to other public employees to obtain and sell a presentence report caused a distinct harm; it violated the privacy of the subject of the PSR by disseminating personal and confidential information about him or her to those who have no legitimate basis to read it, with additional potential resultant harm. App. at 69–70.

Rudolph may have recognized on appeal that he fits within neither of the situations covered by subsection 3D1.2(d), in that the offense levels of the relevant guidelines were not determined on the basis of aggregate harm or loss and they were not written to cover behavior that is "ongoing or continuous" in nature. Indeed, his appellate brief makes only scant effort to justify grouping under that subsection, despite the fact that subsection (d) was the cited basis for

13

grouping in the stipulation. Instead, he argues, apparently for the first time, that grouping was also appropriate under subsections (b) and (c) of S 3D1.2. Because those arguments were not raised before the district court, we review for plain error. Fed. R. Crim. P. 52(b).

By its terms, S 3D1.2(b) applies only to counts involving the same victim. U.S.S.G. S 3D1.2(b). According to the guideline commentary, "[f]or offenses in which there are no identifiable victims . . ., the `victim' for purposes of subsections (a) and (b) is the societal interest that is harmed." U.S.S.G. S 3D1.2, appl. note 2. See also Griswold, 57 F.3d at 295-96 (citing application note 2 to S 3D1.2). As our discussion above suggests, one of the primary societal interests jeopardized by Rudolph's acceptance of the bribes was the integrity and efficacy of the nation's immigration policies, arguably a victimless crime. In contrast, the theft of the PSR was directed to an identifiable victim-- the individual for whom the PSR was prepared. Accordingly, the two offenses involved different victims, rendering subsection (b) of S 3D1.2 inapplicable.

Subsection (c) authorizes grouping "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." U.S.S.G. S 3D1.2(c) (emphasis added). Rudolph argues that this subsection applies because the abuse of his position of trust and authority was embodied in the bribery count and was used as the basis for an upward adjustment on the theft count.

In Griswold, we rejected an argument similar to that made by Rudolph here. There, the defendant argued that his status as a convicted felon was an essential element of one offense and a factor in setting the base offense level in another. Griswold, 57 F.3d at 296. Unpersuaded, we noted that "no conduct embodied in one of the counts is used . . . in the determination of the offense level for another count. Griswold's status as a convicted felon is implicated in establishing the base offense level for each offense. However, no separate conduct by Griswold resulted in double counting." Id. at 296-97. Accordingly, we held that subsection (c) did not apply.

14

Similarly, although Rudolph's status as a public official affected both counts on which he was sentenced, the two counts addressed distinct criminal acts, neither of which encompassed conduct that affected Rudolph's sentence for the other. We therefore cannot find that the district court's failure to group the offenses under subsection (c) of section 3D1.2 constituted error, much less plain error.

IV.

For the reasons set forth above, we will affirm the judgment of conviction and sentence.4

_____

4. This opinion takes no position with respect to the concurring opinion of Chief Judge Becker which is directed to the Sentencing Commission rather than to the disposition of the case before us.

15

BECKER,***** Chief Circuit Judge, concurring. Of the myriad challenges facing the Sentencing Commission when it drafted the Sentencing Guidelines, few were greater than the task of fashioning clear and sensible rules for the grouping of offenses. While what emerged in U.S.S.G. S 3D1.2 is a generally sensible and workable set of principles, this case suggests to me that facets of the grouping Guidelines are forced, and result in formalistic rather than common sense dispositions that yield results contrary to the Commission's intent to limit the significance of the charging decision. While I join in Judge Sloviter's carefully written opinion for the court, and in the judgment, I write separately to suggest that the grouping guidelines would benefit from a redraft that would elevate substance and common sense over form. My comments thus pertain only to Part III of the opinion of the court. I note that, from its earliest days, the Commission has urged the federal judiciary to make suggestions for Guideline revision, viewing them as a means of implementing the ongoing monitoring process. See U.S.S.G. Ch.1 Pt. AS 4(b) (stating that Commission will analyze judicial decisions to determine how to refine Guidelines); see also United States v. Woods, 24 F.3d 514, 518 n.4 (3d Cir. 1994) (discussing same). To its great credit, the Commission has frequently acted upon such suggestions.

I

I see the case as follows. Prior to the offenses of conviction, Rudolph was known by the government's informant, Felix, to have sold stolen government property in return for bribes. The events leading to both the bribery offense and the sale of government property (i.e. theft) offense at issue involved an offer to pay a sum of money in return for goods stolen from the Justice Department. In the instance leading to the theft conviction, Felix made the illicit offer. In the instance leading to the bribery conviction, Felix facilitated an offer made by a third-party, Wesley Clement. In both cases: (1) Rudolph and his buyer haggled

_____

*****Honorable Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.

16

over the amount of the bribe; (2) Rudolph used his  position with the INS to facilitate the transaction; and (3)  the end result was precisely the same -- a theft of government property in return for a bribe.

Under the standard for S 3D1.2(d) grouping announced in United States v. Ketcham, 80 F.3d 789, 796 (3d Cir. 1996), grouping is appropriate if: (1)  the defendant's o ffense behavior has been found to be continuous or ongoing, and (2) the offense guidelines take his ongoing course  of conduct into account. See S 3D1.2(d) (offense guidelines must be "written to cover" ongoing offense behavior). Both the district court and this court have assumed that Rudolph's behavior was ongoing and continuous, see Op. at n.3, and the facts supporting the charged offenses, combined with the fact that Rudolph admitted to two other (uncharged) bribes in return for INS templates on two other occasions, suggest that this assumption is correct.

As previously noted, grouping pursuant to subsection (d) also requires that the offense guidelines "already take into account the fact that there has been a course of harmful conduct." Ketcham, 80 F.3d at 796. The court concludes that neither S 2B1.1 nor S 2C1.1, the relevant offense guidelines here, explicitly takes a continuing course of conduct into account, and hence that Rudolph's offenses should not be grouped. While the court has correctly applied the law, I find this outcome extremely troubling. The express purpose of the grouping guidelines is to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct, while still ensuring incremental punishment for significant additional conduct. See U.S.S.G. Ch. 3 Pt. D, intro. comment. The problem with S 3D1.2(d) is that, in spite of these goals, it requires that the offense guidelines be written to cover ongoing offense behavior. In other words, if we read the Guidelines literally, we could, as intimated in Ketcham, supra, be forced to reject a grouping because of how the offense guidelines are written when the reality of the offense conduct clearly shows substantially identical conduct. This seems to be an unnecessary and untoward exercise in formalism, with the added vice of

17

effectively bringing the charging process back to the center
of the sentencing calculus.[1]

That is what happened here. In my view, the key criminal
behavior underlying both of Rudolph's offenses is the theft
of government property in return for bribes. The only
difference is the particular item Rudolph was asked to steal
from the Justice Department closet. Yet, because one
offense was charged as a bribe and sentenced under
S 2C1.1, and the other offense was charged as a sale of
government property and sentenced under S 2B1.1, the
offenses are held not to be groupable.[2]  Thus, it is the
charging decision and not the actual offense conduct that
is ultimately controlling the sentence here.

The court correctly states that we have not been given
the authority to group offenses "carte blanche" in order to
"override a prosecutor's decision to charge certain offenses
and not others," and that we are limited to the textual
dictates of S 3D1.2. Op. at 9-10, 11. The court's statements,
however, point out precisely the tension that currently
exists between the policy behind the grouping notion, the
purpose of which is, I reiterate, to limit the significance of
the formal charging decision and to prevent multiple
punishment for substantially identical offense conduct
while still ensuring incremental punishment for significant
additional conduct, and the actual directions that we are
given in the Guidelines themselves. Not only are we not

_____

1. The problem with S 3D1.2 highlighted by this case is also reflective of
a larger, systemic shift caused by the adoption of the Guidelines, for
that
regime has, as many commentators have recognized, worked a massive
transfer of discretionary power from the courts to the U.S. Attorneys'
offices. See Albert W. Alschuler, The Failure of Sentencing Guidelines: A
Plea for Less Aggregation, 58 U. Chi. L. Rev. 901, 926-28 (1991).

2. Section 2C1.1(b)(1) provides for a base offense level enhancement if
more than one bribe is involved in the offense. As the court notes, see
Op. at 12, Rudolph was subject to this enhancement because "he took
more than one bribe in exchange for INS templates." If the PSI sale had
been charged as a bribe, it could also have been considered in this
multiple-bribe analysis, rendering grouping of the offenses appropriate.
See also Op. at 5 (noting that had Rudolph's two uncharged bribes been
charged, they would have been groupable with the bribe charged in
count one of the indictment).

18

given power to override the charging decision, but under S 3D1.2(d) as presently drafted, we are powerless to look beyond the charging decision because we must adhere to the text of the offense guidelines -- and not the actual offense conduct -- to decide if grouping is appropriate. What the foregoing analysis suggests is that the grouping guidelines suffer from a drafting flaw, for this result is not, I submit, what the Commission really intended. Neither is it good policy if that was the intended result.

II

This functional type of approach is also necessary to avoid analogous pitfalls arising under our current construction of S 3D1.2(b). Under that subsection, multiple counts are groupable when they "involve the same victim" and constitute "part of a common scheme or plan." See S 3D1.2(b). According to the guideline application notes, when there is no identifiable victim, the "victim" for purposes of a S 3D1.2(b) analysis is "the societal interest that is harmed." See id., appl. note 2. In the present case, the court has rejected Rudolph's subsection (b) claim (i.e. that his theft and bribery offenses were part of a common scheme and involved the same victim) based on the conclusion that the primary societal interest affected by "Rudolph's acceptance of the bribes was the integrity and efficacy of the nation's immigration policies," whereas the victim of the PSI theft offense was the individual with respect to whom the PSI was prepared. See Op. at 14. As we are reviewing here for plain error, see Op. at 14, I cannot fault this result. The court's subsection (b) victim analysis, however, suffers from the same reliance on formalisms that hampers the subsection (d) analysis.

There are at least two ways to look at a bribery offense when we try to assess who is the "victim" of the crime. On the one hand, we could examine the nature of the individual who accepted the bribe. On the other hand, we could also examine the nature of the task or property that was exchanged as consideration for the bribe. In this case, the court has chosen to assess solely the nature of the consideration to determine who or what is the "victim." Not surprisingly, the court concludes that the stolen INS

19

template affects the integrity of the immigration laws while the PSI affects the individual who is its subject. But if we had looked instead to the nature of the bribe acceptor, our analysis would have been quite different. In both Rudolph's bribery and sale of government property offenses, we would find a Justice Department official who jeopardized the integrity of his agency by accepting bribes. Viewed in that light, in both instances the harm caused would be the undermining of the citizenry's trust in government and its officials. Indeed, the district court noted that this was a common ground between Rudolph's offenses. See App. at 69–70.

The unfortunate result of the court's analysis is that a defendant like Rudolph who is charged with stealing one template and one PSI (even though there was evidence that Rudolph had stolen another template) is not eligible to have his offenses grouped, whereas if he happened to be charged with stealing the two templates, his offenses could have been grouped under subsection (b). By limiting our analysis to one side of the bribery equation, our interpretation of the Guidelines enforces formalism over the plain reality that there was one criminal scheme and it just so happened that the defendant was caught stealing a template and a PSI rather than two templates or two PSIs.

Moreover, application note 2 to S 3D1.2 also states:

> [T]he "victim" for purposes of subsections (a) and (b) [in non-identifiable victim cases] is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. . . . Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, i.e., to identify and group "counts involving substantially the same harm."

This application note demonstrates the Commission's recognition that the determination of what interest is harmed will necessarily be analytically imprecise. I believe, therefore, that this note directs us to rely ultimately not on a metaphysical parsing of what elements of society were harmed, but, so long as the societal interests are closely related, on whether the real elements of the offense suggest

20

that there is only one ultimate harm embodied in both counts. See United States v. Riviere, 924 F.2d 1289, 1305 (3d Cir. 1991) (applying earlier version of application note 2 and basing grouping decision on S 3D1.2 policy grounds). While I agree that the subject of the PSI is properly identified as a victim, I believe that because there has been a theft of Justice Department property, the government and the attendant societal interests are also implicated as victims by the sale of the PSI, and that a less formalistic approach could therefore suggest that grouping is appropriate here.

My approach is supported by a recent Seventh Circuit decision addressing a related "same victim" question. In United States v. Wilson, 98 F.3d 281 (7th Cir. 1996), the defendant pled guilty to charges of money laundering and mail fraud arising out of a Ponzi scheme. Relying on a line of authority that proposed that the victim of mail fraud is the person defrauded, while the victim of money laundering is society at large, the government argued that these two offenses were inappropriate for grouping under subsection (b) because they involved different victims, and thus different harms. See Wilson, 98 F.3d at 283. Although finding the government's contention to be correct in the abstract, the court disagreed that this theoretical victim analysis compelled the conclusion that grouping was inappropriate:

> [W]hen the defendant is convicted of laundering the proceeds of his fraud . . . as Wilson was here, there is intuitive force to the argument that the victim of the fraud is also a victim of the transaction designed to hide or "cleanse" the funds of which she was defrauded.

Id. (internal citation omitted). I believe the Seventh Circuit's decision to apply its "intuitive force" rationale in these circumstances once again demonstrates that we must look to the actual offense conduct and the nature of the criminal scheme involved -- and not just rely on abstract victim analysis or other formalisms -- to give meaning to the Commission's intent behind the grouping guidelines.

21

III

The animating purpose of the grouping rules is to identify and recognize when multiple counts of conviction"are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range," and to sanction accordingly. See U.S.S.G. Ch. 3, Pt. D. intro. comment; see also Wilson, 98 F.3d at 282 (basic goal of S 3D1.2 is to combine offenses involving closely related counts). To impose sentences consistent with this purpose, federal sentencing judges must be able to assess the factual realities of the conduct underlying the convictions to determine when the counts are related enough to demand grouping. Section 3D1.2(d), as currently written, and S 3D1.2(b), as currently construed, stand in the way of this process, and the sentence imposed on Deandre Rudolph bears this out.

Therefore, in addition to the revised construction of subsection (b) proposed supra, I also suggest to the Sentencing Commission that a redraft of S 3D1.2(d) may be in order. One possibility would be to draft an application note relating to the list of specific offenses that "are to be grouped" under subsection (d).3 The new note could state that inclusion of the offenses at issue on this list raises a rebuttable presumption that grouping is appropriate so long as the offense behavior is ongoing or continuous in nature, and so long as the purposes of the guidelines would be served by grouping the counts. By the terms of this presumption, grouping could be appropriate even in the absence of explicit language in the offense guidelines accounting for a continuing course of conduct. This would leave the grouping analysis to the judgment of the district

_____

3. Section 3D1.2(d) includes a list of offense guidelines, the offenses covered by which "are to be grouped under this subsection." See S 3D1.2(d). Our current construction of that subsection teaches that inclusion on this list does not mean that grouping is to be automatic, see United States v. Seligsohn, 981 F.2d 1418, 1425 (3d Cir. 1992); see also United States v. Harper, 972 F.2d 321, 322 (11th Cir. 1992) (cited in Seligsohn) (grouping pursuant to the subsection (d) "to be grouped' list not automatic because in some circumstances automatic grouping may detract from main purposes of S 3D1.2).

22

court, rather than mandating its reliance on the formalities of the charging process.4

Another possibility would be to eliminate the "written to cover such behavior" clause entirely, and replace it with language requiring that the offense conduct underlying the potentially groupable counts be "closely intertwined." In that case, subsection (d) would read:

> . . . or if the offense behavior is ongoing or continuous in nature and the offense behavior underlying one of the counts is closely intertwined and represents substantially the same type of wrongful conduct as another of the counts.

Yet another possibility would be to replace the "written to cover" clause with a more general cross-reference to the policy goals outlined in the in the introductory comment to Chapter 3, Part D. In that case, the subsection could read:

> . . . or if the offense behavior is ongoing and continuous in nature and the decision to group is necessary to prevent multiple punishment for substantially identical offense conduct.

_____

4. One can see this type of approach being applied in other cases that functionally construe S 3D1.2(d). For example, the Eighth Circuit has held that a S 2F1.1 (fraud/counterfeiting) offense and a theft offense should be grouped under subsection (d) when they both arise out of the defendant's theft and forgery of U.S. Treasury instruments. See United States v. Manuel, 912 F.2d 204, 206-07 (8th Cir. 1990). The court concluded that:

> Guideline section 3D1.2(d) specifically lists Guidelines sections 2F1.1 and 2B1.1 as offenses that can be grouped together. U.S.S.G. S 3D1.2(d). In light of the fact that these two counts both arose out
>
> of Manuel's theft of United States Treasury instruments, we believe that the counts are sufficiently linked to merit being grouped together for purposes of section 3D1.2(d).

Id. The Manuel court, having found that the two offenses at issue are included among the "to be grouped" list of 3D1.2(d), did not find it necessary to probe further. Instead, it considered whether grouping on the facts of the case would advance the policies behind S 3D1.2 by assessing whether the offenses were "sufficiently linked."

I acknowledge that either type of amendment might generate new ambiguities in application. Such new ambiguities, however, would revolve around the actual facts of the case and the policies of S 3D1.2, and not around the abstract language of the offense guidelines. I believe that such an change could help remove the charging process from the analysis, as the Commission apparently intended, and relocate sentencing discretion with the sentencing judge.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

24